178 N.J. Super. 195 (1981)
428 A.2d 553
IMPAC, INC., AL BOONSTRA, LAFRONT TUGMAN, RAFAELLA CALVINO, ANTHONY TRAINA, JOSEPH TRAINA, HELEN BUTLER, FLORENTINA RINALDO, SILVIO GIANNELLA, AND MARIO OCCHIPINTI, PLAINTIFFS-RESPONDENTS,
v.
THE CITY OF PATERSON, THE CITY COUNCIL OF THE CITY OF PATERSON AND JAMES PETROZELLO CO., INC. AND MAPLEWOOD DISPOSAL CO., A JOINT VENTURE, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.[1].
Argued March 17, 1981.
Decided April 6, 1981.
*197 Before Judges MICHELS, KOLE and ARD.
Irwin H. Tessler, Assistant Corporation Counsel, argued the cause for appellant City of Paterson (Henry Ramer, Corporation Counsel, attorney).
David Samson argued the cause for appellants James Petrozello Co., Inc. and Maplewood Disposal Co. (Kimmelman, Wolff & Samson, attorneys).
Mark Larner argued the cause for respondents (Budd, Larner, Kent, Gross, Picillo & Rosenbaum, attorneys).
The opinion of the court was delivered by KOLE, J.A.D.
Defendants, City of Paterson and a joint venture (P-M) consisting of James Petrozello Co., Inc. and Maplewood Disposal Co. appeal from a grant of summary judgment in favor of plaintiffs Impac, Inc. and several resident taxpayers of Paterson. The trial judge granted the relief sought by plaintiffs by setting aside the city's award of a refuse collection and disposal contract to P-M on the ground that there were certain deficiencies in the bidding procedure and the bid submitted by P-M,[2] and directed the city to readvertise for contract proposals within 30 days of December 10, 1980 and award a contract, the performance of which was to commence within 60 days of that date. It was further ordered that pending the award of a new contract, P-M was to continue to provide refuse collection and *198 disposal service. The judge later complied with the city's request for an extension of the deadline for awarding a new contract by entering an order requiring performance to begin on March 1, 1981. We granted defendants' motion for a stay of judgment pending appeal. We hereby consolidate the appeals of the city and P-M.
On May 2, 1980 the city published an advertisement entitled "Notice to Bidders" in the Paterson News. The same advertisement was placed in The Record on May 5. It gave notice that bids would be received in the office of the city business administrator at 2 p.m. on Friday, May 23, for "refuse collection and disposal service within the boundaries of the city." The contract for such service would run from July 1, 1980 to June 30, 1983. Among other things, the notice provided that bidders were required to comply with the affirmative action requirements of L. 1975, c. 127, and with the bid specifications. The city reserved the right to waive "informalities and make such awards or take action as may be in the best interest of the City."
Under the section of the "detailed bidding specifications" entitled "Disposal" it was provided that the method of disposal was left to the discretion of the contractor. This was made subject to several conditions, one of which reads:
5. At the present time the Hackensack Meadowlands Development Commission (HMDC) has allocated certain existing landfills within the Meadowlands District to accommodate solid waste by County. All Passaic County Solid Waste has been assigned to the P & M Landfill, Belleville Turnpike, North Arlington, N.J. as of April 15, 1980. The dumping rate at this landfill is established at $3.69 per ton.
On or about May 22 the city was informed that the dumping rate listed in the specifications ($3.69 per ton) was incorrect and, although it concluded that this rate was in fact incorrect, it was unable to determine the exact rate. Considering the matter to be "significant enough that it might be misleading to someone who would rely on it," the city's business administrator decided to put out an addendum to the specifications. On the morning of May 23, before the bids were due, the city sent telegrams concerning the change to the contractors who had picked up bid *199 specifications. The addendum gave a "Notice to Bidders" changing the original date for receiving bids from May 23, 1980 to June 3, 1980 and stating that the provision of the foregoing paragraph 5 to the effect that the "dumping rate at this landfill is established at $3.69 per ton" was deleted and that paragraph 5 should read as follows:
At the present time the Hackensack Meadowlands Development Commission (HMDC) has allocated certain existing landfills within the Meadowlands District to accommodate solid waste by county. All Passaic County Solid Waste has been assigned to the P & M Landfill, Belleville Turnpike, North Arlington, N.J. as of April 15, 1980.
The dumping rate at this landfill is to be determined by the bidder and the rate is to accompany the bid.
On May 28 this addendum was published in an advertisement in the Paterson News. No additional bidders picked up the specifications prior to the new June 3 deadline.
On June 3, 1980 bids were submitted by Impac and P-M. The base bid of P-M was $6,338,000, while that of Impac was $6,930,000. After reviewing the experience, past performance and financial condition of P-M and finding it satisfactory, the city's business administrator recommended that the city council award the contract to P-M as the low bidder.
On June 10, prior to the regular meeting of the city council, Impac delivered a letter to it pointing out defects in the bidding procedure and the specifications, as well as P-M's failure to conform its bid to the requirements of the specifications. The council delayed any action on the award until P-M had a chance to respond. After receipt of P-M's response on June 13 and the consideration of the matter by the city's counsel, the latter recommended that, because of deficiencies in the bids of both P-M and Impac, the matter be rebid. According to the city's counsel, P-M did not reveal the names of all of its officers and their stock holdings and did not submit a proper financial statement, and Impac's bid was too high and lacked a proper financial statement. On June 17 the city council considered the problem and, despite the views of its counsel, adopted a resolution accepting P-M's bid. On June 20 P-M and the city executed the contract.
*200 A few days later Impac and nine residents and taxpayers of Paterson instituted this action seeking to invalidate the contract. The trial judge granted plaintiffs' motion for summary judgment. He found several deficiencies in the bidding procedure and P-M's bid: (1) notice of the addendum changing the submission date and the dumping rate was advertised only five days in advance of the bid submission date, rather than the statutorily required ten days (N.J.S.A. 40A:11-23); (2) P-M's financial statement was not properly certified; (3) P-M's statement of ownership was inaccurate, and (4) P-M failed to submit the proper forms required for compliance with affirmative action regulations. He concluded that these deficiencies were substantial rather than technical and thus placed the successful bidder on an unequal footing with other potential bidders. Although there was no evidence of venality on the part of P-M, the judge believed that approval of the bidding would open the door to future fraud, collusion and favoritism. Accordingly, he invalidated the contract and ordered the city to advertise for new bids.
Basically the issues on this appeal are: (1) whether the advertised notice of changes in the bid submission date and the dumping rate was insufficient notice under N.J.S.A. 40A:11-23; (2) whether P-M substantially complied with the bid specifications, and (3) whether the specifications in regard to disposal costs were so ambiguous as to prevent equal competitive bidding.
The trial judge considered the first two issues and ruled in favor of plaintiffs with respect thereto. The record and applicable law support those determinations.
We are not at all persuaded by defendants' arguments to the contrary. The failures to comply with the statutory and bidding requirements here involved are not so trivial or inconsequential, singly or in the aggregate, as to warrant upholding P-M's bid and contract. We fully recognize that the municipality would be effecting a substantial saving in cost  some $600,000 *201  were we to rule otherwise. However, despite that salutary immediate public benefit, we are constrained to invalidate the bid and contract in order not to frustrate or undermine the significant reasons for requiring competitive bidding  securing equality in such bidding and avoiding opportunities or the potential for favoritism, improvidence or corruption. The noncompliance here does not involve simply technical or unimportant matters that may be waived or overlooked. See Manning Engineering, Inc. v. Hudson Cty. Park Comm'n., 74 N.J. 113, 139 (1977), and cases cited therein. Compare, Marvec Allstate, Inc. v. Gray & Fear, Inc., 148 N.J. Super. 481, 486-492 (App.Div. 1977); River Vale Tp. v. R.J. Longo Constr. Co., 127 N.J. Super. 207, 215-216 (Law Div. 1974).
The publication of the notice of the change in the bid submission date and the dumping rate at the landfill designated by the HMDC on a date less than the minimum ten days required by N.J.S.A. 40A:11-23 before the June 3 deadline for receipt of bids plainly violated that statutory provision. Cf. Waste Disposal, Inc. v. Roselle Park, 145 N.J. Super. 217, 221 (App.Div. 1976). In the instant case a prospective bidder who saw the advertisement would only have five days to prepare. The fact that all parties who had already expressed interest in bidding were given sufficient notification is of no consequence. Although there is no proof that any contractor was actually prevented from bidding by reason of the short public notice, the potentially adverse effect on bidding is sufficient to invalidate the procedure here involved. It is not inconceivable that, because of commitment of resources to another job, a contractor who was unable to submit a bid on May 23 might have been interested in bidding had he been given the statutorily mandated advertising period indicating, for example, that the bidding date had been changed to June 3. That the modification was not merely an informational change having no substantive impact on bid preparation is supported by the city's action in advancing the bid submission date to June 3 and advertising the change since it believed it to be of sufficient significance that it might mislead someone who *202 would rely on it. Further, although under the specifications the method of disposal was left to the contractor's discretion and there was no requirement that the HMDC site be used, once the city also indicated in the specifications what the rate was at the HMDC landfill, this provision became material. Potential bidders might have relied on the original notice that the rate was $3.69 a ton and decided not to bid.
A review of P-M's financial statements submitted with its bid shows that they were not in accordance with the requirements of the questionnaire provided bidders by the city. There was no "certified financial statement ... fully itemized in accordance with accepted accounting standards and based on a proper audit." It is not sufficient for this purpose, as P-M claims, that in its separate affidavit of no collusion, also required by the specifications, it certified that all statements in its proposal were true and correct. There is no merit to the argument that this requested financial information constitutes an immaterial variance or surplusage which the city could waive, since, for example, the performance bond submitted by P-M guaranteed its financial capability. Even if P-M interpreted the questionnaire to require only an unaudited statement, other contractors may have been deterred from submitting a bid because they reasonably believed that they would have to submit an audited statement certified by an independent accounting firm. To allow P-M to escape this requirement would negate the principle of keeping all bidders on an equal footing. See, Albert F. Ruehl Co. v. Board of Trustees, 85 N.J. Super. 4, 16-17 (Law Div. 1964). That Impac also may have failed to submit a properly certified audited statement does not negate the fact that P-M failed to comply with this material provision of the specifications.
Consideration of the information supplied by P-M as to the corporate structure of each of the members of the P-M joint venture satisfies us that it substantially departed from the requirements of the city's questionnaire, as well as N.J.S.A. 52:25-24.2, and gave erroneous information of a significant *203 nature. See, George Harms Constr. Co. v. Lincoln Pk., 161 N.J. Super. 367 (Law Div. 1978).
P-M failed to comply, in material respects, with the provisions of the specifications and law relating to affirmative action requirements. See, N.J.S.A. 10:5-32 through 35; N.J.A.C. 17:27-3.3, 17:27-4.3. Under these provisions as a precondition to entering a contract, the bidder must submit evidence that it is operating under an existing federally approved affirmative action program, or a "certificate of employee information report approval" or an "initial employee information report," both relating to an affirmative action program. N.J.A.C. 17:27-4.3(a); 17:27-3.3(a). These requirements, however, are only applicable to contractors employing 50 or more persons. Those with less than 50 instead must provide the public agency with an affidavit stating that fact. N.J.A.C. 17:27-4.3(a).
If, as appears from its attorney's letter to the city council, P-M planned to employ 50 or more people, there is no evidence that, either when it presented its bid or before it entered into the contract, it submitted any of the data required by the statute or regulations. If it intended to employ less than 50 people, it violated the regulations' requirement that it file an affidavit to that effect. Instead of the foregoing it filed what purports to be an affidavit as to nondiscrimination and affirmative action as to employees and applicants for employment involving race, color, religion, marital status, sex, national origin, ancestry or age. In view of the regulations setting forth what must be submitted by a firm with 50 or more employees, the requirement of an affidavit that the contractor employs less than this number is of consequence. A contractor may not escape the requirements of the regulations simply by filing a general affidavit of nondiscrimination. The regulations instead place the burden on the bidder affirmatively to show, by affidavit, that it did not employ or did not intend to employ 50 or more workers, particularly where, as here, there was an indication that it planned to employ more than 50. Failure to so comply placed P-M on an unequal footing with other bidders, *204 who might have been deterred by the cost or necessity of compliance with the affirmative action requirements. Cf. Terminal Constr. Corp. v. Atlantic Cty. Sewerage Auth., 67 N.J. 403, 413 (1975).
The judge did not decide whether the provision of the specifications relating to adjustments in disposal costs during the period of the contract was so ambiguous as to prevent equal competitive bidding. Since readvertising and rebidding will be required, we consider it advisable to determine this issue. We hold that there is no such ambiguity.
The provision contemplated that the city would absorb, under the formula set forth, the contractor's increased disposal costs stemming from changes in dumping rates. Although the provision is not a model of clarity, it is not so ambiguous as to justify the invalidation of the award for that reason. A reasonable reading thereof by a contractor would notify it that it contemplated a pass-through to the municipality during the contract term under the formula for increased disposal costs, involving not only ordered changes in disposal rates as such but also changes therein resulting from assignment of disposal facilities at HMDC by the Public Utilities Commission (PUC).
If a change were made by the PUC from the HMDC landfill to the HMDC baler, conceivably a contractor may have a problem in determining the conversion rate between tons and cubic yards, since the rate at the baler appears to be set at $8.70 a ton and the rate at the landfill is based on cubic yards. In its new specifications, if that is feasible, the city may wish to set out a standard of converting tons to cubic yards. But its failure to do so here does not make the specifications so lacking in definiteness as to justify the invalidation of the contract award. Additionally, the city may wish to make it clear that the formula contemplates disposal rate changes resulting also from assignment of disposal facilities at HMDC during the contract term.
We are satisfied that the alleged uncertainties asserted by Impac in the use of the above formula would not truly adversely affect the equality of competitive bidding. The formula is *205 meant to adjust payments to the contractor by applying disposal cost increases to the established monthly contract payments. In formulating a bid the contractor would base his bid on conditions then prevailing, since obviously it could not forecast what future rates would be imposed at various HMDC sites. Such uncertainty about this type of future condition appears to be inherent in any bid such as that here involved. The city's attempt to provide a mechanism to deal with possible increased costs should not be used as a basis for invalidating the entire bidding procedure. There was essentially no lack of a common standard of comparison in connection with the disposal cost adjustment provision.
The judgment is affirmed.
We hereby direct that the city advertise for new bids to be received within 30 days of this opinion and that work on the new contract should begin no later than 60 days after the date hereof, unless the city shows good cause to the trial judge for further extension of the present arrangement for a limited period of time. In the meantime, P-M will continue to provide services to the municipality under the terms of the present contract. Compensation for past and future services shall be paid on a per diem basis according to the contractual rate. See Pucillo v. New Milford, 73 N.J. 349, 359 (1977).
NOTES
[1] We are consolidating these appeals in this opinion.
[2] Hereafter, unless otherwise indicated, P-M will also refer to the city, since their contentions on this appeal are essentially the same.